Warren P v. Wissahickon School District. Mr. Walpert. Good morning, Your Honors. My name is Scott Walpert. May it please the Court, I would like to reserve two minutes in rebuttal, if I may. You may. Your Honors, this is a special education case in which we really have three pieces. Let me ask you a question. It seems to me that your strongest argument deals with the tuition reimbursement for the 11th grade. And on this particular point, both the hearing officer and the appeals board found in your favor. And I'm looking at the district court opinion here. And your argument, of course, is that the district court didn't really address what the hearing officer and the appeals panel said. The district court said, at least the only thing that I can read, is that the public placement, pursuant to the July 2003 IEP, perhaps provided a means by which it would become appropriate at some unknown future date. But it clearly had the same failing as the previous IEPs. It lacked a behavior management plan. And at the time it was created, the district knew or should have known that any IEP lacking a behavior management plan was not providing Lauren with the appropriate education. That's all I can see that the district court has said in addressing this point. You obviously disagree. Tell us why. Well, Your Honor, in regard to the issue of Delaware Valley Friends School, we believe that there were clearly factual findings made by the appeals panel that the school was not appropriate. There is ample evidence of record which identifies the deficiencies in regard to the program that was offered by that school. I can certainly highlight some of those deficiencies as far as what the district intended and what the appeals panel adopted. One that stands out is this is a case where it's really focused on IEPs. We have IEPs from December of 2002, January of 2003, July, a key one in July of 2003. Then we have what Delaware Valley Friends School calls an educational plan. If you compare, and these documents are of record, if you compare the educational plan that Delaware Valley Friends School advocated for this student versus any of the IEPs advocated by the district that were actually implemented, truly there's no comparison. The district's IEPs are very detailed. They include the required elements under the IDEA, which are identification of needs, which are goals and objectives related to those needs, certainly specially designed instruction and program modifications. That is not what is contained in the Delaware Valley Friends School plan, educational plan. Additionally, the district court identified deficiencies, or at least perceived deficiencies, in the district's IEPs based on that behavioral or alleged lack of behavioral plan. The record is clear. The Delaware Valley Friends School's plan does not contain any type of formal behavioral plan. It's actually much looser than the district's program. One of the arguments I'm going to make in regard to the district's IEPs is you don't look just to see whether there's a plan attached, you look at the program modifications also, which the district court referred to as accommodations. The district's IEPs have numerous elements which are designed to address the behaviors of the student and which did, in fact, address the behaviors of the student. We know that from the record. We know that based on the documents as well as testimony of district witnesses who actually implemented those IEPs. As far as Delaware Valley Friends, to further answer your question, one witness was presented, and I believe the title was head of school. It was certainly someone who was knowledgeable generally about the school. There were documents introduced related to this student specifically, the plan, some grade-related documents. But those documents and the testimony of the head of school do not go in our position as far enough or even close to a finding that would lead to a determination that tuition reimbursement is warranted here based on the expectation or the, more than expectation, based on the occurrence of reasonable progress or reasonable meaningful progress. And in this case, Delaware Valley Friends School, it was of record that there were the same problems actually in some ways maybe worse than what occurred when the student was in the school district. So I would suggest I believe Delaware Valley Friends School, based on the appeals panel's finding, Is it possible that there was some consideration given to the significant improvement that was made during the 12th grade year? I don't believe so, Your Honor, based on the fact that from a record standpoint, the focus was on the 11th grade school year. This is, I mean, we're going back to 2004 when this case was litigated, and the 12th grade school year really wasn't in play. I believe it's not before, it wasn't before any of the lower, the administrators contributed. Actually, my question was meant to be helpful. In other words, is it possible that, you know, you're saying that the plan that existed at Delaware Valley Friends School for the 11th grade was not substantially different than the plan that existed in July of 2003. Is that what you're saying? I'm saying the plan at Delaware Valley Friends School was clearly not as good. And I understand your question. If the district court did consider the 12th grade, any 12th grade progress, then I believe that would be inappropriate because what we're focusing on, the year at issue as far as tuition reimbursement is the 11th grade school year. You know, the district was taking a task as far as what did you do at this particular time and what was in the IEPs. If the district court is going to say that the Delaware Valley Friends School tuition reimbursement is warranted, they need to do the same analysis as far as the time frame. And to answer Your Honor's question, if the 12th grade was looked at, I believe that would be inappropriate. That would be like looking at if she stayed in the district another year, what would have happened, and then using that retroactively. There is a legal principle that's true in all these special ed cases. You look at the IEP at the time it's written. You look at it based on the needs as they exist at that point. You do not apply a retrospective analysis. And although we did not argue conclusions of law or errors of law, I should say, in regard to the scrutiny by the court of the IEPs, some of the comments by the court are somewhat troubling from the standpoint of retrospective application. There's a statement by the court in regard to the December IEP, December of 2002, mid-10th grade school year, saying that the district was, in that IEP, the district was basically doing the same things it had done before. And the district's IEP, that IEP was a failure because the district was relying on accommodations. That's the word the court used. And those accommodations were not successful. Well, that's a looking back piece, in my view, because if you're looking at what occurred before and then you're saying, I'm going to look at the IEP document, but I'm also going to consider how it played out, that is not what the court should do. They should look at what changes were made in the December 2002 IEP in comparison to what was in existence before. Of record, there's a November 2001 IEP. And if you compare the content of that IEP versus the content of the mid-10th grade December 2002 IEP, there's some significant differences. And these were not noted by the district court. The district court's decision did not contain a comparison. And I believe if you're going to make the statement it's a failure because you're doing the same thing as before, that comparison needs to be of record. Was the argument that the, well, just to make sure we start back in the dugout, the hearing officer or person went your way on all three issues. Yes, Your Honor. The appeals counsel said that for the 10th grade there were gaps in terms of what should have been done and those related to what, psychological behavioral issues or? They related really to behavioral issues. Psychological became an issue later on. There was an evaluation done in, I believe it was May or June. And there was a kind of, I think it's a red herring, but the issue of depression. There's not a finding of depression. It was really behavioral, Your Honor. So, in effect, that's what we're looking at. Absolutely. And if we're looking at that, I mean, how much deference, we do have to give deference to the appeals counsel, do we not? You do have to give deference to the appeals panel. But I would suggest that the appeals panel's determination was that the IEPs were deficient because they did not contain a formal written behavioral plan. And simply put, that is not a legal requirement. Pennsylvania Code section, in effect at the time, and there are code sections cited by both parties in their briefs, but those sections do not require that a written behavioral plan be attached to the IEP. There is a process that typically occurs with these IEPs when you have behavioral issues with a student. And when I say behavioral issues, I want to make sure I'm clear. With this particular student, she was frequently late. She was late 36 times in her 9th grade school year, and there was a problem with lateness in her 10th grade school year. And there were also significant problems with homework completion, as well as the student's intention to socialize during the school day as opposed to being in class. So, with that said, the progression, Your Honors, is starting from something that would be less restrictive, just like the continuum as far as placement. And in this particular case, if you look at this December of 2002 IEP compared to what was in there before, there were additions specifically designed to address her behaviors. Very importantly, and this was not noted by the district court, and it was not noted by the appeals panel, there was a change of placement, effective as of December 2002, that would impact the behavioral issue. She went from a resource room environment, which is less intrusive, it's more supervisory, instructive. She went to a part-time learning support environment. And that's a significant change that was not noted by the district court. But to answer your question fully, Your Honor, the progression requires additions of things such as behavioral goals and objectives in the IEP, additions of program modifications to address behaviors, and ultimately you may get to the point with some students, as we did with this student, to say, you know what, a functional behavioral assessment is necessary, and a functional behavioral assessment is the immediate precursor to a written behavior plan, which will be attached to the IEP. That's what happened, Your Honor, in July of 2003, but we were never able to complete that. That IEP was offered in the summer, obviously. The district was never able to complete that because the student was withdrawn at the very beginning of the school year, and certainly the student, I mean, she was accepted at Delaware Valley Friend School sometime before the beginning of the school year, of course, but we were not able to complete that. Had we been able to do that, the IEP team would have been reconvened, the functional behavioral assessment would have been reviewed by a psychologist as well as IEP team and anyone the parents wanted to bring, and then there would have been a written behavioral plan, more formal plan attached to the IEP. I suggest that the district's IEP of July of 2003 was appropriate because it did include that component, and from a big picture standpoint, the progression of let's start with a less restrictive, less invasive type of program to address these behaviors and go progressively up the ladder, that is exactly what this school district did. So from a standpoint of deference to the appeals panel, well, the appeals panel hung their hat on, there's no written behavior plan, and I suggest that that was not required by law and it was not appropriate based on the description I just gave. What's the remedy on the first and second issues? The third issue is pretty obvious, if we agree with you. The remedy on the first issue, Your Honor, I mean, it's really a question of are the IEPs appropriate? If they are appropriate, there's no compensatory education. If they are not appropriate, there is some element of compensatory education. It's up to ultimately the decision maker to determine how much compensatory education is warranted. No, no, no, what do we do? What if we agree with you in every respect? What do we do? Okay. As a practical matter. It would be a reversal of the district court's decision. And effectively, it would be a reinstatement of what the hearing officer decided from a remedy standpoint. But what's the practical effect? Practical effect is denial of all compensatory education claims. So the student does not recover any comp-fed. And right now on the board, I believe it's 650-some-odd hours of comp-fed that the district court awarded through the July 31st order. It would be a denial of tuition reimbursement. So it's fairly, I mean, they're two defined remedy issues. Well, the tuition reimbursement is, it's easy to see what the remedy is there. But I didn't, I wasn't sure with how you deal with the, with number one and number two. Number one is simply denial of relief for compensatory education. And to get to that decision, the court would have to determine that effectively the IEPs were appropriate IEPs. And we're talking about two IEPs that were at issue, the December 2002 and the January of 2003. And I would just suggest that I try to highlight this in my brief. This brief was more factual because I think the facts, it's an issue we're contending there were factual misapplications by the district court. And in this particular case, we believe there was clear error in relation to, you know, the failure to consider the progression. If you look at what happened between November of 2001 and December of 2002, and then a month later, unusual. The IEP team reconvened. They only have to meet once a year. This IEP team reconvened in January of 2003, then again in April of 2003, then again in July of 2003. That's a recognition that we're monitoring, we're making adjustments, and we're trying to offer appropriate program. That's exactly what the district should have done. But in this case, there were substantial additions in the January 2002. May I just follow up on Chief Judge Sirica's question? Sure. And that is, just so I'm clear, because I'm not yet. It's obvious with respect to the alternative placement what the remedy would be if you prevail. As to the other two claims, the practical import simply is we leave the plaintiff where we find her? I mean, is that – I understand efforts were made by the school district along the way. They were subsequently found by one or both of the adjudicative bodies reviewing the IEPs prior to the district court to have been inadequate. But if you win across the board, putting aside the alternative placement, there really is no remedy that we offer in reversing, is there? There is not. She just left as she is. It would be – yeah, there would be no award in – yes, Your Honor. And the answer also with respect to any fee-shifting implications would be obvious as well. Of course. And that remedy would derive from a determination that what the district offered was appropriate. I didn't mention implementation issues, and that was a big issue in this case because of some things that occurred. I see my time is up, unless the court has additional questions. Good. Thank you very much, Mr. Wolpert. Thank you, Your Honor. We'll have you back on rebuttal. Go ahead, Mr. Stanczyk. Good morning. Good morning. My name is Fred Stanczyk. I'm counsel for the family, David and Annemarie Peay, and the student, Lauren Peay. And let me just begin, Your Honor, with the discussion of the tuition reimbursement. First, a very important point in this case is the legal standard by which a parental choice of a private school is judged. There are many cases, and many of them are cited in our brief, that the private school need not meet the same standards or criteria that apply to a public school district when the parents choose a private school. And there's a good reason for that. It's because the parents, as the parents we believe in this case, were looking at their daughter having been through the ninth grade with an unsuccessful program, the tenth grade with an unsuccessful program, and facing the eleventh grade the third year in a row, a child going into the eleventh grade with two more years of school left having serious problems. What was the reasoning of the appeals council and the hearing officer here? I'm sorry, Your Honor. What was the reasoning of the appeals panel and the hearing officer as to why the eleventh grade tuition at D. Delaware Valley Friends School was not reimbursed? Well, the hearing officer did not rule on the issue. The hearing officer simply ruled that. What did the appeals panel say? The appeals panel said that they felt that they looked at the grade reports and the fact that she was struggling and having some of the same problems at DVFS as she did at the school district. Indeed, most of the same problems that she was having. Well, not really, Your Honor, because she was having some of the same problems. You would not expect her to walk into the private school and all of a sudden be a different student. But I do think if you look at, in our brief cited to the district court, which appears at Joint Exhibit 571 to 573, we recount the very detailed testimony that Catherine Schantz, the head of school, provided, which showed not only the program that was being provided at DVFS, but the improvements that, at that point in time, that the student was making. So when the representation that she was having. Improvements where? Improvements in attending class, in completing her homework. No, I'm sorry. By where, I meant at what school? At the Delaware Valley Friends School, at the private school. But what the appeals panel says is that the DVFS does not sufficiently address students' ongoing needs. In assignment completion, distraction, moving to and from class, losing assignments, not completing assignments, and so forth.  Well, it wasn't, Your Honor. In fact, she was successful at that school. And the other point is that. We can't take into account, thank goodness, she had a good 12th grade year, but we can't take that into account. Right, right. But you also, Your Honor, again, I think it's unreasonable to expect her, again, to walk into that school and be a different student on day one. What the appeals panel, and Judge Smith, to answer your question, what the appeals panel I think failed to take into account was the very testimony that I was just referring to in the transcript, in the record, by Katherine Shonsky, which was unrebutted, which showed very clearly that she was at that point making significant improvements in all those areas. And the fact that she was still experiencing, of course she was experiencing those problems, but she was being. . . Did the district court really go into the reasoning, that reasoning that you're giving here now? Yeah. The district court, I believe the district court applied a correct legal standard. Did they give the same reasoning that you're giving now? No, the district judge did not discuss that testimony in great detail. I think what the judge did was, again, correctly indicate that the private school was, in fact, appropriate because it was reasonable for the parents to assume that, given the program that Delaware Valley Friends School offered, and given Lauren's indication of the exact problems she was having, that it was reasonable for them to assume that that was an appropriate program for her. And I'd ask your Honor to take a look at the case of Christian G. by Louise G. versus Lower Marion School District, which is cited in our brief. It's at 919 Federal Supplement 973, in which, again, the same school, the court there looked at a case in which a child was having very similar problems. It's almost the same case, as did Lauren in this case. Behavioral problems, cutting class, and in that case, even worse, getting arrested. The court found that Delaware Valley Friends School, in that case, was an appropriate placement for her. And I think what you have to consider here is not simply that, whether they have a formal IEP in the way that the school district does, because very few private schools do, yet they're approved by the courts as being appropriate. What it's important to consider is that this school offers a high level of support, very small class setting, a supportive system, which each student is given a mentor and so forth. And that is all described in the testimony of Ms. Shantz. Where does the district court say this? The district court does not discuss the evidence in that great a detail. What I'm telling you, Your Honor, is that it's a record. Does it discuss it in any detail? Well, again, I believe that the court is entitled to, or this court is entitled to look to the record also. No, no, but we have to review. We're not judging the record in that sense. We're looking at an opinion that's been appealed that reverses an appeals panel decision. That was quite specific. Well, the district court, again, I think, first of all, pointed out that the appeals panel itself did not cite to the record in support of this decision. And on that issue, correctly determined that it owed the appeals panel decision no deference. That's an aside, but what's the answer to the question? Right. The answer to the question, Your Honor, is that the district court, and I'll look at it again, but the district court did refer to Ms. Shantz's testimony and did refer to the fact that, as I'm recalling it now, that it does offer a supportive setting. It does offer the small classes. The court specifically referred to the fact that Lauren was found to have auditory processing issues and that the De La Vella Friends School addresses the auditory processing issues through the small classes, the preferential seating, and the individual attention. So I don't know if the court addressed every single fact, but they addressed substantially the reasons why the judge felt that De La Vella Friends School wasn't an appropriate school. And I think those reasons are more than sufficient to uphold the judge's decision in this regard. And, again, I think it's important to understand that Lauren was a child who was clearly failing in the public school. Go ahead. Let me take you to the 10th grade year. The district court said that the school district and its teachers' constant adjustment of Lauren's treatment throughout her 10th grade year disclosed its knowledge that Lauren's IEP was not providing an appropriate education. In other words, accommodations were necessary because Lauren's IEP was a failure. Well, if you perceive, based on a lot of communication here and a lot of effort on both sides, parents and the school, that adjustments need to be made, why should the school district be criticized for making adjustments? Well, I think what the court focused on and also what the appeals panel focused on with regard to the 10th grade was that, in fact, the district did not move to the step of having a unified or a uniform plan by which to address those behaviors. It sounded like the school district was somehow scrambling, but, I mean, if we were to adopt that position, basically it would say to school districts, yeah, things may be going bad in November, but don't change it until after the school year. Sorry. That can't be the right answer. No, and we're not saying it is the right answer. What we're saying is the right answer, Your Honor, is that after a point of providing these various accommodations in the IEPs and also the evidence showing that the application of those accommodations was not consistent among the staff members, there was a real need to have a unified, a written plan. But you don't have any problem with the school district making changes throughout the year in consultation with the parents and in consultation with the teachers in order to try to help the child become better adjusted? No, we don't have any problem with that, Your Honor. What we do have a problem with is the fact that, again, it's the school district that has the obligation to write an appropriate IEP on parents. The parents have – they're participating as parents. They're not the experts here. I mean, the thing here is this – there's no manual that says if you do X, Y, and Z, it's going to work every time. The students are different. And it would seem that the school district here gave a lot of effort to try to get this right. And, unfortunately, there were failures, certainly in the 9th, 10th grade, as we find out later in the 11th grade. As I said, thank goodness things turned around in the 12th grade. But the question here is when you're writing a decision, at what point do you take the efforts by the school district and say, too bad, that's just a failure? They really tried, but they just – they lose. Again, I would refer, Your Honor, again, to the fact that, first, and you go back to the evaluation that the school district performed, their evaluation totally ignored the emotional aspects of Lawrence's disability. Was that brought up to them that they were ignoring it? It certainly was. Yes, it certainly was. It was brought up more than once. And, in fact, it was brought up by the parents asking for an independent evaluation and bringing the independent evaluation. Now, when they did, for example, things like the lateness to class, wasn't there, like, a monitor that would meet her at the door? I mean, it looks like they tried a lot of things to try to make sure that she wasn't tardy. What they didn't try was they didn't try an overall and uniform plan, which was necessary in this case because Lawrence was being given, and then the district judge cited that, and certainly the appeals panel, that she was being given inconsistent signals by different staff members, which is, from a therapeutic or educational point of view, not really – at a certain point it became not reasonably calculated to be successful. And we think that happened. We think the judge correctly focused on the school district's evaluation, at which point they knew or should have known that the approach that they were adopting was not successful and they needed to try a fundamentally different approach. When did the depression issues come into play? I'm sorry, Your Honor? When was the school district alerted that there might be depression issues? When they received the evaluation by Dr. Gil, the independent evaluation. And that was when? That was in the summer of 2002, if I'm correct. Summer of 2002, before the 10th grade year? Yes, I believe so, Your Honor. And Dr. Gil conducted specific evaluations, specific assessments, the Conners, the Achenbach, and so forth, to look at the emotional issues.  And as cited in her brief, she testified that she didn't believe that Lauren had an issue with depression because she was able to get out of bed in the morning. And we think that was an insufficient evaluation. The law clearly requires the school district to evaluate, based on any suspected area of disability, they had more than enough reason to suspect depression. If you have an evaluation that fails to address an important area of the student's disability, the IEP then is likely to be faulty. And we think that, again, that was the case here, that the appeals panel in criticizing the hearing officer for in turn criticizing Lauren because she was acting like a child with a disability is correct. And that was an incorrect legal standard that the hearing officer applied in that instance. The appeals panel realized that given the evidence that you have in this case, Lauren had a significant emotional disability. She did have evidence of depression. And that was not addressed in any of the school district's IEPs. So that if you look at the overall plan, and, again, in the inconsistent application, that became a point of frustration for Lauren. I'm looking at the hearing officer's opinion dealing with tuition reimbursement, which is on page 30 and 31 of the joint appendix, volume 1. Is there anything in there that's inaccurate to your knowledge? I'm sorry, page 30 and 31? Yeah. I think the ‑‑ and looking at it here and having looked at it, obviously, before today, the hearing officer, I think, again, failed to acknowledge and failed to acknowledge the evidence in the record, which shows that the level of support that Lauren received at the Delaware Valley Friends School was significantly greater than what she was receiving at the school district. And part of it was the setting itself. It was a much smaller setting. She had a mentor, and she had the assistance of the one‑to‑one instruction. What about the efforts that were made by the school district up until the time she left? Is any of that inaccurate? Well, in our brief, Your Honor, we did question some of the hearing officer's conclusions on that, because I think that the hearing officer, again, in focusing only on Lauren's ‑‑ what she deemed as a failure to cooperate was missing the whole issue of the fact that she's a child with depression. Yeah, I don't see that in here. I just see what the school was ‑‑ it details what the school was doing, the meetings that were held, particularly in the summer, people that were present. Is all of that accurate? Yes, I believe that's ‑‑ I don't know of anything in there that's specifically inaccurate, Your Honor. Our point is that the school district simply did not, first of all, assess Lauren's depression, mental health issues, and did not address it in any of their IAPs. The parents were left with going into a third year at that point of having an IAP that does not address those issues and did not provide any consistent kind of a plan that would be reasonably calculated for meaningful benefit for Lauren. Her problem was not so much she did not have an intellectual problem, a cognitive delay. She had an emotional problem, and the emotional problem was seriously affecting her ability to benefit from school. And we believe that at that point, and certainly after the school district's evaluation, the judge correctly concluded that, yes, the school district should have known at that point that they needed to move to a different level. And in saying, if I can make one more point, in saying that they were going to do a functional behavioral assessment at some point during the 11th grade year, well, that left the parents with a choice of beginning, again, a third year without a consistent plan, and we're given no indication as to how long that would have taken. She's in her second to last year of school. At that point, the parents are clearly justified in rejecting that IAP and sending their daughter to a private school. Thank you very much, Mr. Any other questions here? Rebuttal. Thank you, Your Honor. If I may just briefly, but importantly, I believe there was no finding in regard to depression by the district court or by the appeals panel. If you look at 830 in the record, this is the decision by the hearing officer. The hearing officer, by the way, was a psychologist, and she says, and the evidence presented on this point was flimsy. The district was doing all it could do, all it could have done anyway, short of providing the regular counseling sessions rejected by the parents, et cetera. So there is a finding, actually, by the hearing officer, no depression. There was cross-examination, which is in the record of the independent evaluator on the issue of depression, and there are actually other findings in the hearing officer's opinion in regard to depression not being applicable here. So I believe depression is no basis for any type of decision from a factual standpoint. As was mentioned in the hearing officer decision, the district did offer counseling in the July 2003 IEP. They did that from a standpoint of helping the student address self-advocacy and some of the other areas that are behavioral, and I'm making a distinction again between behavioral versus this depression. There were clearly behavioral issues related to socialization, getting to class, coming late to class, things of that nature, and they're documented in the record, and the district addressed them. From a standpoint of the functional behavioral assessment, it's in the IEP in July of 2003, and FBA is kind of a scientific behavioral textbook process. It involves observation over a course of days, typically. After that, there would be the reconvening of the IEP team, as I mentioned before, and the IEP would be amended. It is not a lengthy process at all, and it was in the IEP, but we needed the student in school so she could be observed in school because that's the environment where these problems existed. And then from the standpoint of tuition reimbursement, Your Honors, the hearing officer did not have to make findings because she never got to the issue of tuition reimbursement. She determined, district, what you offered was FAPE, was free appropriate public education. However, the hearing officer did include numerous detailed findings regarding Delaware Valley Friends School, and I would refer the court to 82627 of the record, which is her decision. There were findings of continued frequent lateness at school, problems completing homework, submitting enough work to obtain credit, continued peer socialization problems, considerable academic difficulty, contributory factor being lack of submission of assignments, seldom completion of homework, and this student, the hearing officer made a finding. She was required by Delaware Valley Friends School to attend summer school after her 10th grade school year in order to pass for the year. She didn't do that. She wasn't going to pass, and that's in the record, Your Honor. So I would say there were findings that certainly there was a basis for the hearing officer and the appeals panel to make that decision, and there's nothing in the district court's record that would rebut that, and we believe that the decision on that basis should be reversed. Good. Any other questions? Thank you. The case was very well argued. We will take this matter under advisory.